IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NUMAN ADNAN AL-KABY,
      Detainee, Camp Cropper
      Baghdad, Iraq
      By His Next Friends;

HAIDER AL-SAEDY,
CYRUS KAR,
      As Next friends of Numan
      Adnan Al-Kaby;
      1616 Beverly Blvd.
      Los Angeles, California 90026

        Petitioners,

    v.                       No. 05-cv-

GEORGE W. BUSH,
      President of the United States
      The White House
      1600 Pennsylvania Ave., N.W.
      Washington, D.C. 20500;

DONALD RUMSFELD,
      Secretary, United States
      Department of Defense
      1000 Defense Pentagon
      Washington, D.C. 20301-1000

FRANCIS J. HARVEY,
      Secretary of the Army
      101 Army Pentagon
      Room 3E-506
      Washington, D.C. 20310-0101

        Respondents.

**PETITION FOR WRIT OF <u>HABEAS CORPUS</u>**

## INTRODUCTION

1.  Numan Adnan Al-Kaby, a long-term lawful permanent resident of the United States and a refugee from Iraq, is presently being held indefinitely and virtually incommunicado in the custody of the United States at Camp Cropper, a detention facility operated by the United States near Baghdad, Iraq, without access to counsel and without being afforded any fair process whatsoever by which he might effectively challenge his detention. Although a military court at Camp Cropper cleared Mr. Al-Kaby of all charges and declared him an "Innocent Civilian" more than six weeks ago, he continues to be held in solitary confinement. The government's refusal to give effect to an adjudication of innocence is unheard of in our system of justice and eviscerates the bedrock assumptions of our constitutional democracy. Left uncorrected, this system becomes one wherein an individual is not innocent until proven guilty but guilty even after being proven innocent.

2.  Haider Al-Saedy, the first cousin of Mr. Al-Kaby, and Cyrus Kar, an American citizen who became friends with Mr. Al-Kaby during his own unlawful 55-day detention at Camp Cropper, petition this Court as next friends of Mr. Al-Kaby for a writ of habeas corpus releasing him from government custody.

3.  Mr. Al-Kaby, a Shiite who had always opposed the regime of Saddam Hussein, escaped from Iraq as a refugee in1991.  He feared persecution for his refusal to continue serving in Saddam's army during its brutal and lawless crackdown on Shiites in southern Iraq.  After spending more than three years in a refugee camp in Saudi Arabia, Mr. Al-Kaby arrived in the United States with a grant of political asylum.  He thereupon lived with his cousin Mr. Al-Saedy, with whom he had lived in the same bunk at the refugee camp.  Mr. Al-Kaby and Mr. Al-Saedy worked together in factories and, most recently, at Middle Eastern restaurants

1

they owned in Kalamazoo, Michigan. Mr. Al-Kaby became a lawful permanent resident and applied for U.S. citizenship in 2003. In the summer of 2004, Mr. Al-Kaby, who strongly supported the war in Iraq and the overthrow of Saddam Hussein, traveled to Iraq after thirteen years to see his family, from whom he had been separated for so long.

4. Upon his arrival in Baghdad, Mr. Al-Kaby reunited with his family and re-married. After an attempt to operate a beauty supply shop and a brief job with the U.S. military as an interpreter, Mr. Al-Kaby began working for an American company that was engaged in post-war construction. One day in early April 2005, he called in sick to work. When he returned to work two days later, he discovered that the base where he worked had experienced a mortar attack on his sick-day. The U.S. military accused him of participating in the mortar attack, arguing that he must have taken a sick-day because he knew in advance that an attack had been planned. Mr. Al-Kaby strenuously denied these accusations and proclaimed his innocence, but nevertheless the U.S. military placed him in custody. He has been detained by the United States ever since.

5. In June 2005, Mr. Al-Kaby found himself in solitary confinement at Camp Cropper, a U.S. military detention facility near the Baghdad airport. In the next cell was Cyrus Kar, an American filmmaker who had traveled to Iraq to film a documentary. The U.S. military had detained Mr. Kar because he had been a passenger in a taxi that contained timers capable of being used to make bombs. The taxi driver had confessed that the timers were his and that he had no connection to his passengers, and the FBI had also cleared Mr. Kar of all suspicion. Nevertheless, Mr. Kar was still detained in the cell next to Mr. Al-Kaby's.

6. The guards at Camp Cropper referred to Mr. Al-Kaby and Mr. Kar as the only prisoners who had been "cleared," and they allowed them to take a daily hour of recreation together. The

2

two men were not allowed to talk to attorneys or consular officials, and they could not call their families regularly or even read magazines or newspapers. They were only allowed to talk to each other, so they came to know each other well. For several weeks, neither man knew if he had been charged of a crime, whether he would see a judge, or even how long he would be held.

7.  On July 4, 2005, the U.S. government conducted separate military hearings for Mr. Al-Kaby and Mr. Kar to determine whether they were "enemy combatants." Presiding military officers determined both men to be "innocent civilians" within the meaning of the Geneva Conventions and recommended their release. Mr. Kar was not released until a week later, after his family members had filed a petition for a writ of habeas corpus with this Court, and the Court had scheduled a hearing at which the government was ordered to show why he should not be released from custody. Mr. Al-Kaby, whose family did not even know his whereabouts until Mr. Kar contacted them upon his own release, still languishes indefinitely in solitary confinement. The government's utter disregard for a decision of its own military judges is not only breathtaking as a denial of the most elemental principles of due process and fairness, but also subjects Mr. Al-Kaby to limitless and arbitrary detention that is patently unlawful.

8.  Mr. Al-Kaby is being held under color and authority of the Executive, in violation of the Constitution, laws and treaties of the United States as well as customary international law. This Court should issue a Writ of Habeas Corpus to require Respondents to establish to this Court whether there is a lawful basis for Mr. Al-Kaby's detention.

3

## JURISDICTION AND VENUE

9.  Petitioners' claims arise under 28 U.S.C. § 2241 because Respondents are detaining Mr. Al-Kaby "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States." He is entitled to habeas corpus relief as well as any other relief this Court may deem appropriate.

10. Petitioners bring this action under 28 U.S.C. §§ 2241(a), (c)(1), and (c)(3) and 2242, and invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; and Article III of, and the Due Process Clause of the Fifth Amendment to, the United States Constitution, the Geneva Conventions, and international law. Petitioners claim that Mr. Al-Kaby's detention is unlawful under the Fifth and Sixth Amendments to the United States Constitution, the Geneva Conventions, and customary international law. Because they seek injunctive and declaratory relief, Petitioners also rely on Fed. R. Civ. P. 57 and 65.

11. This Court is empowered to grant this writ of habeas corpus under 28 U.S.C. § 2241, and to consider the Petition filed by Haider Al-Saedy and Cyrus Kar on behalf and as next friends of Numan Al-Kaby pursuant to 28 U.S.C. § 2242, because Mr. Al-Kaby is detained unlawfully by the federal government without access to the courts.  See, e.g., Rasul v. Bush, 542 U.S. 466, 124 S.Ct. 2686, 2698 (2004) (holding that federal habeas corpus jurisdiction "requires nothing more" than a claim of unlawful detention by the federal government and personal jurisdiction over the custodians).  This Court also has jurisdiction pursuant to the Suspension Clause, Article I § 9, cl. 2 of the United States Constitution, Article III of the United States Constitution, and the Due Process Clause of the Fifth Amendment to the United States Constitution, because those provisions entitle Petitioners to a judicial forum in which to

contest the legal validity of Mr. Al-Kaby's continuing detention.  In addition, this court has jurisdiction over Petitioners' claims under the Alien Tort Statute, 28 U.S.C. § 1350, for prolonged arbitrary detention in violation of the law of nations and treaties of the United States.  Rasul, 542 U.S. 466, 124 S.Ct. at 2698-99.

12. This Court has subject matter jurisdiction over this petition because Mr. Al-Kaby is a long-time lawful permanent resident of the U.S. who is detained at a United States military base under color of U.S. law.  Rasul, 124 S.Ct. at 2698 (noting that U.S. courts have traditionally been open even to "nonresident aliens" and that nothing "categorically excludes aliens detained in military custody outside the United States from the privilege of litigation in U.S. courts"). Camp Cropper, where Mr. Al-Kaby is detained, is as a functional and practical matter within the plenary and exclusive "jurisdiction or dominion exercised in fact" of the United States, such that this Court has jurisdiction over a claim brought by a lawful permanent resident who is detained there.  Id. at 2697.

13. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction, and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

14. Venue is proper in this district because one or more of the Respondents reside within the jurisdiction of this Court and are accordingly amenable to service of process in this district.

## PARTIES

15. Petitioner Numan Adnan Al-Kaby is presently incarcerated and held in United States military custody at Camp Cropper, a United States detention facility located near Baghdad, Iraq.  See

Declaration of Cyrus Kar ("Kar Decl."). Mr. Al-Kaby is a permanent resident of the United States and an applicant for United States citizenship. <u>See</u> Declaration of Haider Al-Saedy ("Al-Saedy Decl.") ¶¶ 12, 19.

16. Haider Al-Saedy is a resident of Kalamazoo, Michigan and a first cousin of Numan Adnan Al-Kaby. Al-Saedy Decl. ¶ 1. Mr. Al-Saedy is a legal permanent resident and an applicant for United States citizenship. <u>Id</u>. ¶ 2. Because Mr. Al-Kaby has been denied access to legal counsel and to the courts of the United States, Mr. Al-Saedy acts as his next friend.

17. Cyrus Kar is a resident of Los Angeles, California and a friend of Numan Adnan Al-Kaby. Kar Decl. ¶¶ 1-2. Mr. Kar met and became friends with Mr. Al-Kaby during his own 55-day detention at Camp Cropper. <u>Id</u>. Confined in adjacent cells for twenty-three hours each day for about a month, Mr. Al-Kaby and Mr. Kar conversed at length. <u>Id</u>. ¶¶ 13-24. Mr. Kar also assisted Mr. Al-Kaby by explaining documents to him and by contacting Mr. Al-Kaby's family, after his own release, to inform them of Mr. Al-Kaby's health and condition. <u>Id</u>. ¶¶ 37-38, 42. Mr. Kar is dedicated to acting in Mr. Al-Kaby's best interest. Because Mr. Al-Kaby has been denied access to legal counsel and to the courts of the United States, Mr. Al-Kaby acts as his next friend.

18. Respondent George W. Bush is the President of the United States. As Commander-in-Chief of the United States military, he bears ultimate legal responsibility for the unlawful detention of Petitioner by the United States military. He is sued in his official capacity.

19. Respondent Donald Rumsfeld is the Secretary of Defense of the United States. As a delegate of aspects of the President's authority as Commander-in-Chief and under the laws and usages of war, he has been charged with maintaining custody and control of the Petitioner. He is sued in his official capacity.

20. Respondent Francis J. Harvey, Secretary of the Army, is responsible for the Army's military operations in Iraq and the custodian responsible for Mr. Al-Kaby's detention. He is sued in his official capacity.

21. Respondents Bush, Rumsfeld and Harvey are either ultimately responsible for or have been charged with the responsibility of maintaining the custody and control of detainees at Camp Cropper.

**STATEMENT OF FACTS**

22. Numan Adnan Al-Kaby was born in 1966 in Iraq. Al-Saedy Decl. ¶ 3. He grew up in Basra, a city in southern Iraq, and lived with his mother, father, and siblings. Id. Mr. Al-Kaby is Shiite, and his family opposed the government of Saddam Hussein. Id. ¶ 4.

23. Like most young Iraqi men, Mr. Al-Kaby served in the Iraq Army when he was young. Al-Saedy Decl. ¶ 10. In 1991, after the U.S. forces drove Saddam out of Kuwait in the Persian Gulf War, there was an uprising against Saddam Hussein's government in Iraq. Id. ¶¶ 6-8. Led by Shiite groups in the south, the uprising was ultimately unsuccessful and resulted in a severe and brutal crackdown on Shiite areas in the south, including Basra. Id. During that time, Mr. Al-Kaby left Iraq because he could not morally justify serving in Saddam's army anymore. Id. ¶ 10. Soldiers who deserted were being killed, so Mr. Al-Kaby fled from Iraq and found refuge with American soldiers. Id.

24. Mr. Al-Kaby joined approximately 30,000 other Iraqi refugees in a refugee camp in Rafhi, Saudi Arabia. Al-Saedy Decl. ¶ 11. Once there, he reunited with his cousin, Haider Al-Saedy, with whom he lived in the same bunk for more than three years. Id. ¶ 9. They endured harsh conditions in the camp rather than returning to Iraq out of fear for their lives.

25. While at the refugee camp, Mr. Al-Kaby wrote two plays and helped put on plays about the situation in Iraq and the troubles facing Iraqi refugees.  Al-Saedy Decl. ¶ 11.  In 1994, Mr. Al-Kaby was processed for a visa to the United States, and in late 1994, he came to the United States as a refugee. Id. ¶ 12.

26. When he first came to the United States, Mr. Al-Kaby moved in with a distant cousin in Rockford, Illinois who helped him find a job at a local factory.  Al-Saedy Decl. ¶ 13.  At that time, Mr. Al-Kaby spoke very little English.  Id.

27. After some time, Mr. Al-Kaby moved to Salt Lake City, Utah, where he worked at an eatery in the airport, making cinnamon rolls.  Al-Saedy Decl. ¶ 13.  In 1997, Mr. Al-Kaby's cousin Mr. Al-Saedy also left the refugee camp and came to the United States.  Id. ¶ 12.  He moved in with Mr. Al-Kaby, and Mr. Al-Kaby found him a job at the same eatery.  Id. ¶ 13.

28. After a few months in Utah, Mr. Al-Saedy moved to South Bend, Indiana and found a new job at a factory.  Al-Saedy Decl. ¶ 14.  Mr. Al-Kaby got married in Salt Lake City, and he and his wife moved to South Bend in the fall of 1999.  Id. Mr. Al-Kaby obtained a job at the same factory where Mr. Al-Saedy worked.  Id.

29. Mr. Al-Kaby was laid off from that job.  Al-Saedy Decl. ¶ 15.  He studied dye-setting for a few months in Chicago and worked at restaurants in South Bend.  Id. During this time, he and his wife separated and later divorced.  Id.

30. Mr. Al-Kaby then moved to Kalamazoo, Michigan, where he began a new relationship.  Al-Saedy Decl. ¶ 16.  He persuaded Mr. Al-Saedy to join him there, and the two of them opened a restaurant serving Middle Eastern food in Kalamazoo in late 2001.  Id.  Later they owned another small restaurant that also served Middle Eastern food and had a hookah lounge.  Id.

Mr. Al-Kaby and Mr. Al-Saedy operated these restaurants together for almost three years and also lived together in Kalamazoo.  Id. ¶ 17.

31. When the United States invaded Iraq in 2002, Mr. Al-Kaby strongly supported the effort to overthrow Saddam Hussein.  Al-Saedy Decl. ¶ 18.  He believed that the U.S. should do whatever was necessary to rid Iraq of Saddam.  Id.  Once, when an anti-war rally passed in front of their restaurant, Mr. Al-Kaby stepped out onto the street and told protestors that as an Iraqi, he supported all efforts to oust Saddam because he was a cruel and brutal dictator.  Id. He also gave information to the FBI to assist in the U.S. government's efforts to oust Saddam.  See Declaration of Dawn Bouaouad ("Bouaouad Decl.") ¶¶ 12-18.

32. In 2003, Mr. Al-Kaby applied for United States citizenship.  Al-Saedy Decl. ¶ 19.  He has not yet been granted citizenship.  Id.

33. In the summer of 2004, Mr. Al-Saedy and Mr. Al-Kaby sold the restaurants because they were losing money.  Al-Saedy Decl. ¶ 20.  Mr. Al-Saedy obtained a job at a factory, and Mr. Al-Kaby searched for another job.  Id.

34. Mr. Al-Kaby wanted to return to Iraq to see his family, after not seeing them for more than a decade.  Al-Saedy Decl. ¶ 20.  After the U.S. invasion of Iraq and the ouster of Saddam Hussein, Mr. Al-Kaby felt that it might finally be safe to return.  Id. When Mr. Al-Kaby and Mr. Al-Saedy closed the restaurants, Mr. Al-Kaby took the opportunity to visit his family in Iraq.  Id.

35. In July 2004, Mr. Al-Kaby traveled to Iraq.  Upon arriving in Baghdad, Mr. Al-Kaby stayed with his parents and siblings in his parents' house in Baghdad, and he re-married.  He opened a small beauty supply shop that he operated for a short time.  Kar Decl. ¶ 25.  After that closed, he worked as a translator with the U.S. military for a short while.  Id.  Unhappy with

9

the security situation connected with the military job, he quit.  Id. Later, he found a job with an American company engaged in construction.  Id. ¶ 26.

36. Mr. Al-Kaby was using his English skills and his knowledge of America to help the community where he lived.  When a local water pipe broke, Mr. Al-Kaby reached out to American and Iraqi officials and got a new pipe installed.  Al-Saedy Decl. ¶ 24.  He also helped other Iraqis find jobs in construction with the American company for which he worked.  Id. ¶ 25.

37. In April 2005, Mr. Al-Kaby called in sick to his job one day, sending a letter to his boss.  Kar Decl. ¶ 26.  When he returned to work, American soldiers confronted him.  Id. They informed him that the base where he worked had experienced a mortar attack on the day that he had called in sick, and they suspected him of being involved in the attack.  Id. They implied that he had taken off from work because he knew in advance of the attack.  Id. Mr. Al-Kaby strongly denied all of these accusations, told them that he did not know anything about the attack, and that he was innocent.  Id. Nevertheless, the soldiers arrested him and took him into U.S. military custody.  Id.  He has been detained since that time for the past four months. Id. ¶ 27.

38. Mr. Al-Kaby was not allowed to call his family immediately after his arrest.  Kar Decl. ¶ 28. His family later found out about his arrest through a cousin who had worked at the base.  Al-Saedy Decl. ¶ 26-28.  No one in the family knew the reason for the arrest or the whereabouts of Mr. Al-Kaby after the arrest.  Id.   The family approached the American company where Mr. Al-Kaby worked, but were not given any information.  Id. ¶ 27.

39. The U.S. military placed Mr. Al-Kaby in solitary confinement at Camp Cropper in June 2005.  Kar Decl. ¶ 14-15.  There he met Cyrus Kar, an American filmmaker who had come to

Iraq to film footage for a documentary. <u>Id</u>. The U.S. military had detained Mr. Kar because he had been a passenger in a taxi that contained timers capable of being used to make bombs. <u>Id</u>. ¶¶ 2-12. The taxi driver had confessed that the timers were his and his alone, and that he had no connection to his passengers, including Mr. Kar. <u>Id</u>. In addition, the FBI had cleared Mr. Kar of all suspicion after a thorough investigation of his home and property in the United States. <u>Id</u>. Mr. Kar had even taken and passed a lie detector test while in custody. <u>Id</u>. Nevertheless, the U.S. military had continued to detain him, in a cell next to the cell of Mr. Al-Kaby at Camp Cropper. <u>Id</u>.

40. The U.S. Army guards at Camp Cropper told Mr. Al-Kaby and Mr. Kar that they were the only prisoners who had been "cleared." Kar Decl. ¶ 14. Unlike other prisoners in solitary confinement, the guards allowed Mr. Al-Kaby and Mr. Kar to take their daily hour of recreation together in an outdoor cage. <u>Id</u>. ¶ 15.

41. Mr. Al-Kaby and Mr. Kar had no access to attorneys or consular officials, and they were not allowed regular, unmonitored phone calls to their families. Kar Decl. ¶ 28. They had no information regarding when or if they would be released, or for how long they would be detained. <u>Id</u>. They lacked even access to newspapers, magazines, and radios. <u>Id</u>. Neither Mr. Al-Kaby nor Mr. Kar ever saw any written charges, and neither knew if he would ever see a judge. <u>Id</u>.

42. Mr. Al-Kaby and Mr. Kar were not allowed to talk to other detainees. Kar Decl. ¶ 14-15. The guards made one exception, allowing Mr. Al-Kaby and Mr. Kar to speak to each other because they had both been "cleared." <u>Id</u>. As a result, Mr. Al-Kaby and Mr. Kar got to know each very well and talked every day during their recreation hour. <u>Id</u>. ¶¶ 16-17.

43. On July 1, 2005, Mr. Al-Kaby and Mr. Kar were each notified in writing that the U.S. military would hold a military hearing to determine each man's status under the Geneva Conventions. Kar Decl. ¶¶ 29-31. In these written notices, issued months after the arrest of Mr. Kaby and Mr. Kar, the government finally notified the men of the alleged bases of their detention. Id.; Kar Decl., Exh. 2. Mr. Kar was accused of being in possession of materials used to make improvised explosive devices. Id. Petitioners are informed and believe that Mr. Al-Kaby was accused to participating in a mortar attack on a U.S. base. Id. ¶ 38.

44. On July 4, 2005, the government held separate military hearings before three U.S. military officers for Mr. Al-Kaby and Mr. Kar. Kar Decl. ¶¶ 32-36. Both men attempted to call witnesses and asked for the production of documents relating to their cases, but their requests were basically denied. Id. ¶¶ 33, 35. The government failed to provide an attorney or any other representative for Mr. Al-Kaby and Mr. Kar. Id.

45. Despite this, a panel of three military officers acting as judges determined that Mr. Al-Kaby was an "Innocent Civilian" under the Geneva Convention and recommended his release. Kar Decl. ¶¶ 37-38. These military judges also determined that Mr. Kar was an "Innocent Civilian" and recommended his release. Id. Even after these hearings, however, Mr. Al-Kaby and Mr. Kar were not told when they would be released.

46. Mr. Kar was finally released a week later on July 10, 2005, after a habeas petition was filed on Mr. Kar's behalf in this Court, and a hearing was scheduled for July 11, 2005 for the government to show why his detention was lawful. Kar Decl. ¶ 39. He returned to the United States soon thereafter.

47. Mr. Al-Kaby remains in indefinite detention despite having been cleared of all suspicion and charges in a military hearing. Mr. Al-Kaby is not an enemy combatant and has never

engaged in hostilities against the United States.  He is an innocent civilian who supported the American invasion of Iraq and who even volunteered information to the FBI to help its efforts.  Bouaouad Decl. ¶¶ 12-18. Friends and family describe Mr. Al-Kaby as a peaceful man who fully supported the American effort in Iraq and would never act in any way to jeopardize the rebuilding of his native country.  Id. ¶ 18; Al-Saedy Decl. ¶¶ 29-32; see Declaration of Sabah Al-Ubaidy, ¶¶ 10-13.

48. Mr. Al-Kaby is trapped in the nightmarish abyss of the American detention system in Iraq, where even a final determination of innocence by a United States military tribunal has not secured his release.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Unlawful Arbitrary and Indefinite Detention Under the
### Due Process Clause of the Fifth Amendment

49. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

50. Respondents' arbitrary and indefinite detention of Mr. Al-Kaby constitutes a denial of the most fundamental right guaranteed by the Due Process Clause – freedom from arbitrary and indefinite detention.  Mr. Al-Kaby's detention is arbitrary and serves no legitimate governmental interests because he was adjudicated innocent of any charges at a hearing convened and conducted by military judges for the stated purpose of ascertaining his status as an enemy combatant or innocent civilian.  Although it was determined that he is an innocent civilian, the government has refused to accord any legal effect to its own hearing and adjudication.  Petitioner's continued detention is therefore completely unjustified and unjustifiable.

13

51. In addition, notwithstanding the determination that Mr. Al-Kaby is an innocent civilian, petitioner was denied constitutionally sufficient process in that he was denied meaningful access to counsel and a fair opportunity to call witnesses on his behalf and to confront his accusers.

### SECOND CLAIM FOR RELIEF
### Denial of Access to Counsel under the
### Fifth and Sixth Amendments and *Habeas Corpus*

52. Petitioners reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

53. Respondents have denied Mr. Al-Kaby any access to counsel, in violation of his rights under the Fifth and Sixth Amendments to the U.S. Constitution and under the Habeas Corpus Clause. See Hamdi, 124 S.Ct. at 2652 (holding that Hamdi "unquestionably has the right to access to counsel in connection with the proceedings" concerning the validity of his detention.).

### THIRD CLAIM FOR RELIEF
### Prolonged Arbitrary Detention In
### Violation of Customary International Law

54. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

55. International customary law prohibits prolonged arbitrary detention. Respondents have breached and continue to breach their obligations under customary international law, accepted by and binding on the United States, by seizing and continuing to hold Mr. Al-Kaby even after a determination that he is an innocent civilian at a hearing convened and conducted by the United States government.

56. Prolonged arbitrary detention is one of only seven universally condemned wrongs that the Restatement (Third) of Foreign Relations describes as violating customary international law (Rest. 3d Foreign Relations § 702), and is prohibited by, inter alia, Article 9 of the Universal Declaration of Human Rights, Article 9 of the International Covenant on Civil and Political Rights ("ICCPR"). 999 U.N.T.S 171, ratified by the United States on June 8, 1992, and by numerous other international treaties and documents.  The United States has repeatedly affirmed its acceptance of this norm of customary international law, including, inter alia, in its submissions to the International Court of Justice during the Iranian hostages case.

57. In addition, the customary international law of armed conflict prohibits the arbitrary deprivation of liberty in both international and non-international armed conflicts.  See Jean-Marie Henkaerts & Louise Doswald-Beck, eds., Int'l Committee for the Red Cross, Customary International Humanitarian Law, Volume I: Rules, 344-52 (2005) (stating the rule and collecting citations to U.N. Security Council resolutions, national legislation, national military manuals, and international and national jurisprudence supporting the rule); id. at 347 ("No official contrary practice was found with respect to either international or non-international armed conflicts. Alleged cases of unlawful deprivation of liberty have been condemned.").  The United States has officially endorsed this rule_ even in "military operations other than war." U.S. Judge Advocate General, Operational Law Handbook 59 (2003) ("No one shall be subject to arbitrary arrest or detention.") (emphasis in original).

## FOURTH CLAIM FOR RELIEF
### Violation of the Geneva Conventions

58. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as it set forth fully herein.

15

59. Cruel treatment is prohibited by Article 3 common to all four Geneva Conventions.  Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field of August 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; and Geneva Convention relative to the Protection of Civilian Persons in Time of War of August 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Common Article 3").  The prohibition on cruel treatment in Common Article 3 forbids arbitrary deprivation of liberty during armed conflicts.  See Jean-Marie Henkaerts & Louise Doswald-Beck, eds., Int'l Committee for the Red Cross, Customary International Humanitarian Law, Volume I: Rules, 344 (2005) ("Common Article 3 of the Geneva Conventions. . . require[s] that all civilians and persons hors de combat be treated humanely. . ., arbitrary deprivation of liberty is not compatible with this requirement."). The United States ratified the Geneva Conventions on August 2, 1955.  Common Article 3 of the Geneva Conventions is implemented by Chapter 1-6 of Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, effective from November 1, 1997.

60. By the actions described above, respondents have violated and continue to violate the rights of Mr. Al-Kaby to be free from arbitrary and indefinite deprivation of liberty as guaranteed by the prohibition on cruel treatment under Common Article 3.

## FIFTH CLAIM FOR RELIEF
### Alien Tort Statute – Prolonged Arbitrary Detention

61. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as it set forth fully herein.

62. The acts described herein constitute prolonged arbitrary detention in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violate customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

63. Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the prolonged arbitrary detention of Mr. Al-Kaby in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violate customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

64. As a result of Respondents' unlawful conduct, Mr. Al-Kaby, upon information and belief, has been and is being deprived of his physical liberty and is forcibly separated from his family for a prolonged period of time.  He is therefore entitled to habeas corpus, declaratory, and injunctive relief, and such other relief as the Court may deem appropriate.

## PRAYER FOR RELIEF

WHEREFORE, petitioners respectfully pray for relief as follows:

1.  Order Numan Adnan Al-Kaby released from Respondents' unlawful custody;

2. Order Respondents to allow counsel to meet and confer with Numan Adnan Al-Kaby, in private and unmonitored attorney-client conversations, both by phone and in person;

3. Order Respondents to cease all interrogations of Numan Adnan Al-Kaby, direct or indirect, while this litigation is pending;

4. Order and declare that the prolonged, indefinite, and restrictive detention of Numan Adnan Al-Kaby is arbitrary and unlawful, a deprivation of liberty without due process in violation of the Fifth Amendment to the United States Constitution, a deprivation of right to counsel in violation of the Fifth and Sixth Amendments, and in violation of the law of nations and treaties of the United States;

5. Order and declare that Numan Adnan Al-Kaby is being held in violation of customary international law, the Geneva Conventions, and applicable military regulations;

6. To the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing at which the parties may adduce proof in support of their allegations, and order that Numan Adnan Al-Kaby be made present for that hearing telephonically or in person;

7. Grant such other relief as the Court may deem necessary and appropriate to protect Petitioners' rights under the United States Constitution, federal statutory and regulatory law, and international law; and

8.  Grant Petitioners reasonable attorneys' fees and costs.

Dated:   August 31, 2005

                                  Respectfully submitted,

                                  Counsel for Petitioners:

                                  Mark D. Rosenbaum
                                  Ranjana Natarajan
                                  Ahilan T. Arulanantham
                                  ACLU Foundation of Southern California
                                   1616 Beverly Boulevard
                                  Los Angeles, California  90026
                                  Tel:  (213) 977-9500, x224

                                  Arthur B. Spitzer, D.C. Bar No. 235960
                                  American Civil Liberties Union
                                    of the National Capital Area
                                  1400 20th Street, N.W. #119
                                  Washington, D.C.  20036
                                  Tel: (202) 457-0800

                                  Kary L. Moss
                                  Michael J. Steinberg
                                  American Civil Liberties Union
                                    of Michigan
                                  60 West Hancock Street
                                  Detroit, MI  48201
                                  Tel:  (313)578-6814

                                  Steven R. Shapiro
                                  Lucas Guttentag
                                  Lee Gelernt
                                  Ben Wizner
                                  American Civil Liberties Union Foundation
                                  125 Broad Street
                                  New York, New York  10004
                                  Tel: (212) 549-2500

19

Erwin Chemerinsky
Duke University School of Law
Science Drive & Towerview Road
Durham, North Carolina 27708
Tel: (919) 613-7173

Paul Hoffman
Schonbrun, DeSimone, Seplow, Harris &
Hoffman
723 Ocean Front Walk
Venice, California  90291
Tel: (310) 396-0731

20