## DECLARATION OF CYRUS KAR

I, Cyrus Kar, declare:

The facts stated in this declaration are based upon my personal knowledge and if called to testify I could and would do so competently as follows:

1.    I am the next friend of Petitioner Numan Al-Kaby in the petition for a writ of habeas corpus releasing Mr. Al-Kaby from detention. Numan and I became friends earlier this year when he and I were imprisoned in adjacent cells at Camp Cropper in Baghdad, Iraq. I am dedicated to Numan's best interest, and in helping him to get released from detention.

### Arrest And Detention In Iraq

2.    I am a United States citizen, a resident of Los Angeles, and a veteran of the United States Navy. I work as a documentary filmmaker and am presently completing my first documentary film on the historical figure of Cyrus the Great, who was both a conqueror and a promoter of human rights. In May 2005, after obtaining visas and permission from the Iraqi, American, and Kurdish authorities, I went to Iraq to film footage of Babylon, a historical site in present-day Iraq where Cyrus the Great had been, for my documentary.

3.    On or about May 17, 2005, my cameraman and I were arrested by Iraqi police at a vehicle checkpoint near Baghdad. We later came to know that we had been arrested because the trunk of the taxi in which we were riding contained washing machine timers, which can be used to make improvised explosive devices. My cameraman and I had no connection to the taxi driver and had never met him before, and the timers belonged to the driver, not to us. Nevertheless, we were arrested and taken to an Iraqi police station. When I told them that I was an American citizen, I was transferred to Unites States military custody.

1

4.    The U.S. military forces blindfolded me and my cameraman and transported us to four different detention centers. Ultimately, they took my cameraman to Abu Ghraib, and they took me to Camp Cropper, a detention facility that I later found out was located near the Baghdad airport and held many high-value detainees. Both my cameraman and I were held in detention for approximately 55 days before finally being released.

5.    The government did not provide me with any written charges, but both the United States military and FBI interrogated me after my arrest. I asked the interrogators if I could have a lawyer, and they told me that no lawyer was available. Since I had nothing to hide, and I had no other choice, I answered their questions. I told them that I had no connection to the washing machine timers or to the taxi driver, and I even authorized a full search of my home and belongings in Los Angeles. I also agreed to take a lie detector test administered by the FBI.

6.    Before I took the lie detector test, I asked again if I could have a lawyer, and I was told that no lawyer was available. Thinking that it would clear me, I took the test and answered questions truthfully that I had no involvement with the taxi driver or the timers. The person who administered the test told me that I had passed. I later learned that by early June, the FBI had thoroughly searched my home and property, cleared me of all suspicion, and had informed my family in the United States that I would be returning to Los Angeles in a matter of days. No one told me any of this information at the time.

7.    While I was in detention, I did not get any information about how long I could expect to be there, whether I would ever get an attorney or see a judge, or even whether I was charged with doing anything wrong. Besides asking for an attorney, I also asked several times to speak to someone from the U.S. embassy, and I asked for a copy of my file. Those requests also

went unanswered. True and complete copies of three of my written requests at Camp Cropper are attached hereto as Exhibit 1.

8.      I had virtually no access to my family in the United States, either. In late May, for the first time, the FBI let me make a short phone call to my aunt in Los Angeles. There was only enough time to let my aunt know that I was in Iraq, in the custody of the U.S. military, and that I was hoping to be home soon. They let me call once again in early June, and during this second phone call, my aunt asked me why I was in detention. I started to tell her that it was because of a taxi driver, but the guards cut me off. Again, the phone call was very brief. At the end of June, they gave me one more brief phone call, during which my aunt told me that the FBI had cleared me and that I had passed my lie detector test. I had not known this before. She asked when I would be home, and I told her what the guards told me, which is that I would be allowed one phone call each month, and more than that I did not know.

9.      For the first six weeks of my detention, I got virtually no information about why I was being held, how long I would be held, whether my case would ever be heard by a court or someone with the power to release me, or whether I would be released. It was during this time that I met Numan Al-Kaby, a fellow detainee at Camp Cropper.

10.     On July 1, 2005, a full six weeks after my detention began, I finally received a written notice of the reason for my detention. The Camp commandant served me with a letter stating that my status under the Geneva Convention was in doubt, and that there would be a Detainee Status Board hearing would be held on July 4, 2005 to determine my status. A true and complete copy of this letter is attached hereto as Exhibit 2. The letter said that I could not have an attorney, but I could have a personal representative. But I had no such representative and none was appointed for me.

3

11.     On July 4, 2005, I had a Detainee Status Board hearing before three military

officers acting as judges. See infra, ¶¶ 32-33. At the end of the hearing, the military judges told

me that they had determined that I was an "Innocent Civilian" under the Geneva Convention, and

they were recommending my release. Two days later, on July 6, 2005, I got a letter that said the

same thing. The military did not release me from detention until four days later, on July 10,

2005.

12.     After I was released, I found out that in early July, my family filed a habeas

petition on my behalf in this Court, and a hearing was scheduled for the afternoon of July 11, at

which the government was required to justify my detention. I also found out that in early July,

front page stories about my situation appeared in the New York Times and the Los Angeles

Times, and my case attracted worldwide attention. I believe these factors are what ultimately led

to my release. To date, no one has ever explained why it was necessary to keep me in solitary

confinement and virtually incommunicado for so long, especially after the FBI had cleared me of

all suspicion by early June.

**Meeting Numan Al-Kaby In Detention**

13.     For approximately seven weeks from May 18 to July 10, 2005, I was in detention

at Camp Cropper, a U.S. Army detention facility at the airport in Baghdad, Iraq. At Camp

Cropper, I was placed in solitary confinement in a small one-person cell that measured

approximately eight feet by eight feet. There was a small opening in the door to the cell, called a

wicket, through which they would put in meals. I spent 23 hours a day inside that cell. For one

hour each day, I was allowed to go for recreation into a 15' x 15' chain-link cage that was

covered with a tarp on all sides and placed outdoors. There was no toilet inside my cell, so the

Military Police escorted me to a restroom outside my cell when I needed to use the restroom.

4

14.     While I was in solitary confinement, I met and became acquainted with Numan Al Kaby, who was detained in the cell next to mine. About three weeks into my detention, the Military Police ("MP's") brought in Numan to the cell next to mine. On the day that Numan arrived, the MP's told me that they had a friend for me. They said that like me, Numan, or Prisoner Number 170 as he was called, had been "cleared too," so they would allow us to take our daily hour of outdoor recreation together.

15.     Soon after Numan's arrival, the MP's took me and Numan to the toilet at the same time. Numan introduced himself and asked me where I was from, but I did not respond with any detail. I didn't want to take my recreation with Numan or talk to him because I was scared that the government might have sent him to spy on me. No detainee in solitary confinement was allowed to talk to any other detainee, so it was unusual for the MP's to allow me to talk to any other detainee. The MP's said that it was allowed only because we were both "cleared." Numan told me more about himself and why he got detained, and he said that since he was the only person that I could talk to and vice versa, we should talk to each other. After hearing more about his life, I realized that he was not a spy, and I warmed up to him.

16.     Numan and I took our one hour of recreation together almost every day after he arrived. We usually went out in the middle of the night, since it was cooler then. From the outdoor cage, we could not see out except to look at the sky. During the hour of recreation, we would talk a lot, and Numan liked to tell me about his life.

17.     Numan and I also talked when we were taken to and from the bathroom. Every now and then, we would stick our heads out of the wicket in the doors of our cells to talk. Sometimes an MP would tell us to stop talking, but then other MP's would say that it was okay for us to talk because we had both been cleared.

5

**Numan Al-Kaby's History**

18.    Numan told me a lot of details about his life, including his life in the United States, what he had been doing since coming to Iraq in 2004, and why he was in detention. I remember the details very well because he was the only person with whom I talked at the jail.

19.    Numan said that he was thirty-eight years old, that he was born in Iraq, and that his family was originally from Basra. He said that he had been in the Iraqi Army during the Iran-Iraq war.

20.    Numan said that he had left Iraq many years ago, just after the first Persian Gulf War. He said he left Iraq because he was Shiite, and after the Gulf War, there was a Shiite uprising against Saddam that was based in Basra. Saddam's Baath party had come down hard on that area, so he sought refuge with the American soldiers. He had spent almost four years in an American refugee camp in Saudi Arabia, after which he went to the United States with refugee papers.

21.    Numan told me that he had been in the United States for more than ten years. After coming to the United States, he first lived in a city outside Chicago, and later in Salt Lake City, Utah. Numan told me that he had married an east African woman in Salt Lake City and later got divorced. He said that he had worked at the Salt Lake City airport, that he had taken some English classes, and that he had worked as a waiter at an Olive Garden restaurant.

22.    Numan said he later moved to Indiana, and then ended up moving to Kalamazoo, Michigan. He said that he opened up a restaurant and hookah lounge in Kalamazoo. He said that the restaurant lost money because he gave out a lot of things for free, so he eventually had to close it down. After that business was closed down, he decided to come to Iraq.

23.    Numan had not seen his family in Iraq for a long time, so he wanted to come see them. He also said that one of the reasons he came to Iraq was to help the family of a disappeared American fighter pilot whose plane had crashed in Iraq during the 1991 Persian Gulf war. Apparently, Numan had information about what happened to this pilot, maybe because he had been in the Iraqi army at that time, and he was planning to help the pilot's family find out more about their disappeared family member.

24.    In Iraq, Numan was staying in Baghdad with his family for several months. His family got him remarried. Numan said that two of his brothers worked for the Iraqi police. He had been staying with his family and working when he was arrested and placed in detention.

## Numan Al Kaby's Arrest And Detention In Iraq

25.    Numan told me that he had been arrested because he was suspected of being involved with a mortar attack on a United States base in Iraq. He said that after coming to Iraq, he had owned a shop for a while. Then he had worked for a short time with the U.S. Army as an interpreter, going out with them on patrol. Numan said that he had seen two people killed by the Army, which made him very sad and frustrated. He decided that he couldn't handle that job, and he quit.

26.    Numan then began working as something like a project manager for an independent contractor, a private American company that worked on a United States base. One day, he called in sick to his boss. Two days later, when he came back to work, he found out that the base had received mortar fire on the day that he had called in sick. A handful of Marines confronted him, told him that he was fired, and then arrested him. When he asked why he was being arrested, they told him that they suspected him of being involved with the mortar attack

7

because he had called in sick on the day of the attack. Numan told them that he didn't know anything about the attack and had nothing to do with it, but he was arrested anyway.

27. Numan said that he had been in detention since the day of his arrest. When Numan came to the cell next to mine at Camp Cropper in June, he had already been in detention for two months.

28. Like me, Numan had no access to a lawyer or to consular officials while in detention. Like me, he was allowed very rare phone calls to his family, and no visitors of any kind. He was also in solitary confinement, in an eight by eight cell, totally isolated from the world. We weren't even allowed any newspapers, magazines, or radio. Neither of us had any idea of when, or if, we would be released. The guards consistently told us that we were the only prisoners in Camp Cropper who had been "cleared." When we asked them why we were still in jail, they didn't give us more information.

29. At the very end of June, an Army officer named Master Sergeant Lawrence came to my cell and told me that I had been cleared and that they knew that I had just been caught in a wrong place, wrong time situation. They said that they were just waiting for "the i's to be dotted and the t's to be crossed" before they released me. That was the only time anyone indicated that I would be released soon.

30. On July 1, 2005, I found out I was going to have a hearing. The Camp Commandant came to my cell and made me sign a notice informing me that a hearing to determine my status was scheduled for July 4. See Exhibit 2. The notice said that I was accused of being in possession of explosive materials.

31. I heard the Camp Commandant also go to Numan's cell, so I learned that Numan was going to have a hearing also. That night, while we were taking our recreation together,

8

Numan told me that he got a letter too, and he asked me what this hearing was about. I told him that it might be the only way that someone in charge finally heard our cases and decided to release us. Numan was skeptical, and he was worried that we wouldn't be released. He thought that I would be released before him, and he said he would be sad when I left.

32.    On the morning of July 4, 2005, the guards took me to a different room in the prison, and I had a hearing. There were three military judges in the case, and there was a court reporter who transcribed the entire hearing. It was clear that such a hearing had never been held before, as no one was sure of their roles or the rules. An enlisted officer tried to swear in the three military judges, and the judges tried to swear in the enlisted officer, who acted as a bailiff. No one was sure who should be sworn in first. In the end, the judges swore in the Sergeant, who in turn swore them in.

33.    I asked the judges for my Army and FBI interrogators to appear as witnesses and for file documents, including records of my interrogations, my lie detector test results, and medical records while in custody. I also called as a witness my cameraman. The judges told me that all the documents I asked for were unavailable, except for the lie detector test results, which they read aloud and which confirmed that I had told the truth when I said I had nothing to do with the taxi driver or the timers. The judges told me that all the witnesses were unavailable except my cameraman, who was brought in. Both he and I testified. Then the judges sent me out of the room for about ten minutes. When they called me back in, the judges told me that they were recommending my release.

34.    After my hearing, I went back to my cell, and at that time, Numan was not in his cell. I thought that he must have had his hearing after mine.

9

35.     That night, Numan and I talked about our hearings. Like me, he had had a hearing with three military judges and a court reporter. He had also called witnesses, and the judges had told him that they were all unavailable. He told me that he didn't understand what the judges had told him at the end, so he didn't know if he would be released.

36.     That night, a guard told us that both of us had been found innocent. Since we were innocent, the guards let us have sodas or Gatorade if we wanted and told us that we were just waiting to be released.

37.     On July 6, 2005, Lt. Colonel Haas met Numan and me together in Numan's cell and sat down with us. She presented us each with a letter that had to be signed. A true and complete copy of the letter presented to me is attached hereto as Exhibit 3. The letter she gave me stated that a Detainee Status Board had been convened to determine our status. It said that I had been detained because I was a passenger in a taxicab in which they had found washing machine timers. It also said that the Board had determined that I was an "Innocent Civilian" under the Geneva Convention. The letter said that an "Innocent Civilian" is a "civilian who does not pose a threat to the security of coalition forces, or its mission, and should be immediately returned to his home or released." I signed the acknowledgment and gave it to the Colonel.

38.     Numan didn't understand his letter, so he asked me to read it for him, and the Colonel said that was fine, so I read his letter. Numan's letter was almost exactly the same as mine. His letter also said that a Detainee Status Board had been convened to determine his status. It said that he had been detained because he was suspected of participating in a mortar attack on a U.S. military base. It also said that the Board had determined that he was an "Innocent Civilian." I told him that the Board had found him to be innocent. He was relieved, and he signed an acknowledgment of the letter and gave it to the Colonel.

39.    On July 10, 2005, I was released from Camp Cropper. I was extremely happy to be released. I thought that Numan would be released at the same time, but he was not.

40.    Once I was released, I was taken to the U.S. Embassy in Baghdad for processing. I went there a few times over the next week to get my passport and other documents. On one of these trips to the embassy, an embassy official named Sarah Francia mentioned casually that she was working on the case of someone whom the government had thought was a U.S. citizen but they had just found that he was not. I asked who that was, and she said that it was Prisoner Number 170, by which I knew she meant Numan. She did not say anything further.

41.    Numan was crushed when I was released and he was not. His hopes for release had been high, since he was also found innocent at the hearing. Long before my release, Numan had given me the phone number of his family and asked me to call them in case I got out before he did. I had even thought that if we were both released, he could be my guide around Iraq, taking me to locations where I could finish filming my documentary.

42.    The second day after I was released, I called Numan's family. I spoke to Numan's sister, who speaks English. I told her that I had been in jail with Numan. I told her that Numan was in good health, that he had been found innocent in a military hearing, and that he should be out soon. She was happy to hear about Numan and thanked me for calling her.

43.    I called Numan's family again on August 6, 2005. I spoke to a family member who did not speak much English. I said Numan's name, and they asked me repeatedly in English, "Where is he." I gathered that Numan was still in jail.

44.    I think it's extremely unfair and unjust that Numan is still in detention, especially since he was cleared of all suspicions by the United States military. I can't imagine why the

11

government would detain him for another six weeks after he was found to be an "Innocent Civilian."

45.     Numan is a pleasant, friendly, and naive guy. He was trying to make a go of it in Iraq and helping the Americans rebuild his country after the war. I saw with my own eyes that the Detainee Status Board had found him to be an "Innocent Civilian." I can't believe that they continue to detain him even after he was found to be innocent. That kind of detention is contrary to all our government's democratic principles. I think the government should release Numan as soon as possible. Like my family, his family must be suffering a great deal not knowing where he is and not being able to visit him.

46.     From my own experience in detention at Camp Cropper, I can say that being in solitary confinement in an Iraqi prison was incredibly demoralizing. There is no court, no lawyer, no jail library to learn about the law, no way to really defend yourself. In addition, you can't see your family or even talk to them when you want. I was overjoyed to finally have a hearing and be declared innocent. I can't imagine how despondent Numan must be to know that he has been found innocent but yet still left to rot in jail. I think our country can do better than that, especially for someone who is a refugee from Saddam Hussein's regime and whose country we are trying to rebuild and make into a democracy.

47.     As Numan's next friend in this lawsuit, I am truly dedicated to doing whatever I lawfully can, in his best interest, in order to get him released from custody as soon as possible.

I declare under penalty of perjury under the laws of the United States and the laws of the state of California that the foregoing is true and correct. Executed this 24th day of August 2005 in Los Angeles, California.

_____
Cyrus Kar

12

**EXHIBIT 1**

ACKING NUMBER _382_

**ACILITY REQUEST FORM CAMP CROPPER**
إستمارة طلب تسهيلات معسكر كروبر

DATE:(YYYYMMDD)
التاريخ : _6/14/05_

O: ☒ CAMP COMMANDANT ☐ ISG ☐ RCLO ☐ ICRC ☐ MI ☐ MEDICAL ☐ OTHER
آمر المعسكر الصليب الاحمر طبي أخرى إلى :

REQUEST THAT I BE AUTHORIZED TO SPEAK TO FOLLOWING SECTION OR HAVE THE FOLLOWING QUESTION ANSWERED
يتضمن الطلب تفويضي للتحدث للقسم ( او الاجابة على الاسئلة المذكورة ادناه

N# (complete): _US91Z-200174CI_ رقم السجين (كامل) :

JILDING #: _7_ رقم المبنى : | ROOM #: _9_ رقم الغرفة :

EQUEST TO NAME , TITLE OR SECTION: الطلب موجه الى اسم ( او لقب (او قسم :
_Colonel Haas_

UBJECT AND PURPOSE OF REQUEST: موضوع وغرض الطلب :

Dear Lt. Colonel.
I have been held without being charged for almost one month now. I've been patient and compliant, yet I sit here, fate unknown. I now, officially and for the record, ~~and~~ request a lawyer. My whole incarceration has been an outrageous affront to my Civil Rights as a citizen of the United States. I understand this administration considers the U.S. constitution & Bill of rights as little more than a nuisance. But they are still the Law of land and its protection I'm afforded does not cease outside of America's borders, especially by my own government. So I demand my right as bestowed on me by the United States Constitution to either be charged or released immediately. And please provide me with an attorney immediately. Thank you, Cyrus Kar [signature] # 174

P.S. Under the Freedom of Information Act, I would like a copy of all my request forms & responses to them.

ACTION (Do not write below this line. To be filled out by facility staff only)

. REQUEST OR INTERVIEW WAS: ☐ AUTHORIZED ☐ UNAUTHORIZED | Date :(yyyymmdd)
how reason in remarks)

. FORWARD TO (Name or Section): _LTC Haas_ | Date :(yyyymmdd)

. REMARKS OR DISPOSITION:
Forwarded your request to higher Command.

. NAME , GRADE, TITLE AND SIGNATURE OF DISPOSITION OFFICIAL: | Date :(yyyymmdd)
_Carol V Haas, LTC, Commandant_ [signature] Carol V Haas | _20050615_

ll requests will be answered in a timely manner. Upon completion return to HVD administrative trailer for filing. Copy will be given to detainee.

DD510

Do not turn in more than one request form on the same issue. Turning in multiple forms for same issue may result in disciplinary action.
لا تقدم أكثر من طلب لنفس الموضوع. تقديم طلبات عديدة لنفس الموضوع يؤدي الى اجراء تأديبي .

SGT Prairie DAY NCOIC 7AEB

TRACKING NUMBER 372

**FACILITY REQUEST FORM CAMP CROPPER**

إستمارة طلب تسهيلات معسكر كروبر

DATE:(YYYYMMDD) التاريخ:
June 6, 2005

TO: ☒ CAMP COMMANDANT ☐ ISG ☐ RCLO ☐ ICRC ☐ MI ☐ MEDICAL ☐ OTHER_____
الى : اخرى  طبي  الصليب الاحمر    أمر المعسكر

REQUEST THAT I BE AUTHORIZED TO SPEAK TO FOLLOWING SECTION OR HAVE THE FOLLOWING QUESTION ANSWERED.
يتضمن الطلب تفويضي للتحدث للقسم أو الاجابة على الاسئلة المذكورة أدناه

ISN# (complete): رقم السجين (كامل):    US91Z-200174C1

BUILDING #: رقم المبنى: 7    ROOM #: رقم الغرفة: 9

REQUEST TO NAME , TITLE OR SECTION:    الطلب موجه الى اسم أو لقب أوقسم:

SUBJECT AND PURPOSE OF REQUEST:    موضوع وغرض الطلب:

As a citizen of the United States, I would like to exercise my right to speak to a representative of the U.S. Embassy in Baghdad. I have made the same request on 3 other occasions at the Paliwoda detention facility.

As a resident of the State of California, I also would like the mailing and e-mail address of United States Senator Barbara Boxer (D-California). All but one of my request forms have gone unanswered. Why go through the facade of having them?

**ACTION** (Do not write below this line. To be filled out by facility staff only)    Date :(yyyymmdd)

5. REQUEST OR INTERVIEW WAS: ☐AUTHORIZED ☐UNAUTHORIZED
(show reason in remarks)    Date :(yyyymmdd)

6. FORWARD TO (Name or Section):    Date :(yyyymmdd) 20050608
LTC HAAS

7. REMARKS OR DISPOSITION:
Forwarded your request to speak with a member of the Embassy. As I explained earlier, only RCM's to family members regarding family issues are mailed from the facility

8. NAME , GRADE, TITLE AND SIGNATURE OF DISPOSITION OFFICIAL: Carol V Naas LTC Commandant Carol V Naas    Date :(yyyymmdd) 20050613

All requests will be answered in a timely manner.  Upon completion return to HVD administrative trailer for filing.  Copy will be given to detainee.

**DD510**
*Do not turn in more than one request form on the same issue. Turning in multiple forms for same issue may result in disciplinary action.

لا تقدم أكثر من طلب لنفس الموضوع. تقديم طلبات عديدة لنفس الموضوع يؤدي الى اجراء او اتخاذ

SGT Prairie
NCOIC Davis 7A/B

TRACKING NUMBER _____ NCOIC Davis 7A/B

FACILITY REQUEST FORM CAMP CROPPER  استمارة طلب تسهيلات معسكر كروبر    DATE:(YYYYMMDD) التاريخ : 6/22/05

TO: ☒ CAMP COMMANDANT  ☐ ISG  ☐ RCLO  ☐ ICRC  ☐ MI  ☐ MEDICAL  ☐ OTHER _____
الى : آمر المعتقل    الصليب الأحمر    طبي    اخرى طبي

REQUEST THAT I BE AUTHORIZED TO SPEAK TO FOLLOWING SECTION OR HAVE THE FOLLOWING QUESTION ANSWERED
يتضمن الطلب تفويضي للتحدث للقسم او الاجابة على الاسئلة المذكورة ادنا

ISN# (complete): US 9IZ-2001741C    رقم السجين (كامل):

BUILDING #: 7  رقم المبنى :    ROOM #: 9  رقم الغرفة :

REQUEST TO NAME , TITLE OR SECTION:  الطلب موجه الى اسم او لقب او قسم :
Colonel Haas

SUBJECT AND PURPOSE OF REQUEST:  موضوع وغرض الطلب :
Dear Colonel Haas,
    Since arriving in the U.S. in 1966 as an infant, I have found American people to be some of the most kind & just people of all the societies in which I've lived. It's not right to generalize; the are good & bad everywhere. But as a whole it is a benevolent nation - even the most ardent conservatives root for the underdog and are quick to acknowledge injustice. The disillusionment of this truth has been, by far, the hardest part of my incarceration. As an independent filmmaker, on his last dime & a shoestring budget, I am an underdog. And my imprisonment without evidence, the right to counsel, or any due process is unjust. Even if it can be justified through a nealy-rigged legal loophole, how can it be reconciled morally or ethically? The imprisonment of my cameraman and I can readily be found in third-world, facist goverments. But not - to my knowledge - in the country I have come to love and to serve. It has been one month since anyone from intelligence or anyone here else has talked to me. Every month that I'm detained, I take a step closer to financial ruin. Please help me understand my disposition so that I might mitigate the financial blow I'm incuring with my continued

ACTION  (Do not write below this line. To be filled out by facility staff only)

REQUEST OR INTERVIEW WAS: ☐ AUTHORIZED  ☐ UNAUTHORIZED    Date :(yyyymmdd)
(show reason in remarks)

FORWARD TO (Name or Section):    Date :(yyyymmdd)
LTC HAAS

REMARKS OR DISPOSITION:
Forwarded your request to the investigators

NAME , GRADE, TITLE AND SIGNATURE OF DISPOSITION OFFICIAL:    Date :(yyyymmdd)
Carol Haas, LTC, Cdr  Carol Haas    2005 06 28

All requests will be answered in a timely manner.  Upon completion return to HVD administrative trailer for filing.  Copy will be given to detainee.

DD510
Do not turn in more than one request form on the same issue.  Turning in multiple forms for same issue may result in disciplinary action.
لا تقدم اكثر من طلب لنفس الموضوع . تقديم طلبات عديدة لنفس الموضوع يؤدى الى اجراء تأديبى .

*[right margin, vertical handwriting]* Please provide me with an intelligence update of my imprisonment. Thank you for your continued understanding & consideration. Jonathan Cyrus Klar #174

**EXHIBIT 2**



**MULTI-NATIONAL FORCE - IRAQ**
CAMP VICTORY, BAGHDAD
APO AE 09342-1400

REPLY TO
ATTENTION:

June 30, 2005

Office of the Staff Judge Advocate

Name: Cyrus Kar
ISN:　200174

Subject:　Detainee Status Board

Dear Cyrus Kar:

　　　Your status under Article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War, 12 August 1949 (GPW) is in doubt. Accordingly, a Detainee Status Board, under Article 5 of the GPW to determine your status has been scheduled for 4 July 2005.

　　　Basis of Detention:　You are accused of being in possession of IED materials.

<u>You have the following rights at the Detainee Status Board</u>:

　　(1) You have the right to be present at all open sessions of the Detainee Status Board;
　　(2) You have the right to testify or not to testify.
　　(3) You do not have the right to legal counsel, but you may have a personal representative assist you at the hearing if the personal representative is immediately available.
　　(4) You have the right to present evidence, including the testimony of witnesses who are immediately available.
　　(5) You have the right to examine and cross-examine witnesses, and examine evidence. However, sensitive information may be masked or reviewed by the Detainee Status Board in closed session.

<u>The following procedures apply at the Detainee Status Board Hearings</u>:

　　(1) All evidence, including hearsay evidence, is admissible.
　　(2) The Detainee Status Board hearing is not adversarial. A recorder may present evidence to the board. The board may question detainees and other witnesses with the consent of the President of the Detainee Status Board. Witnesses will testify under an oath or affirmation to tell the truth.
　　(3) A detainee will be granted the status of prisoner of war unless it is established by a preponderance of the evidence that he is not entitled to such status. The standard for determining the truth of facts is proof by a preponderance of evidence.
　　(4) The board's decisions are determined by a majority of voting members.

- 2 -

If you wish to have evidence, witnesses or a personal representative at the Detainee Status Board, you must deliver a written request to the Camp Commander of your detention facility before 4 July 2005. The Detainee Status Board will attempt to accommodate reasonable requests for persons who it finds are immediately available.

Sincerely,

John Dunlap
Lieutenant Colonel, U.S. Army
President of the Detainee Status Board

## ACKNOWLEDGEMENT OF RECEIPT:

Cyrus Kar

Date: 7/1/05

Time: 19:49

## CERTIFICATE OF SERVICE:

On 1 July , 2005 I Carol V Haas personally served a copy of "Geneva Status Notification" dated 29 June 2005 on Cyrus Kar. This document notifies him of his rights and procedures at his Detention Status Board, in accordance with the Geneva Convention Relative to the Treatment of Prisoners of War, 12 August 1949 Article 5.

Signed: Carol V Haas

**EXHIBIT 3**



# MULTI-NATIONAL FORCE - IRAQ
## CAMP VICTORY, BAGHDAD
### APO AE 09342-1400

REPLY TO
ATTENTION:

July 6, 2005

Office of the Staff Judge Advocate

Name: Cyrus Kar
ISN: 200174

## Amended Notice of Detainee Status Board

Dear Mr. Cyrus Kar:

As you know, a Detainee Status Board has been convened to determine your legal status as a U.S. citizen detained in the conflict in Iraq. The notice you received and acknowledged on July 1, 2005 for the hearing at which you appeared on July 4, 2005 inadvertently omitted the criteria which the board applied to the facts of your case in determining your status. The purpose of this amended notification is to apprise you of the screening criteria the board actually applied to your case. Because the board determined that your status as "Innocent Civilian" and recommended your release, there is no need to for you to make another appearance before the board. The following criteria were applied to your case in determining your status:

(1) Enemy Combatant shall mean any person that US or Allied Forces could properly detain under the laws and customs of war. An enemy combatant includes, but is not necessarily limited to, a member or agent of Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. Enemy combatants may include those individuals who pose a threat to the United States or US interests when there is reason to believe that such individuals have engaged in, aided, or conspired to commit, acts of international terrorism or acts in preparation therefore, that have caused, threaten to cause, or have as their aim to cause, injury or adverse effects on the United States, its citizens, national security, foreign policy, or economy.

(2) Security Internee (SI). A Security Internee shall mean an individual interned for their own protection or because they pose a threat to the security of coalition forces, or its mission. This includes persons detained for committing offenses (including attempts) against multinational forces (or previous coalition forces), members of the Iraqi Interim Government, Non-government Organizations, state infrastructure or any person accused of committing war crimes or crimes against humanity.

(3) Innocent Civilian. An Innocent Civilian shall mean a civilian who does not pose a threat to the security of coalition forces, or its mission, and should be immediately returned to his home or released.

The unclassified factual basis that was used by the Board to determine your status is as follows:

You were detained at an Iraqi Army vehicle checkpoint in the vicinity of Balad. A search of the vehicle you were riding in yielded suspected Improvised Explosive Devise (IED) making material of 36 washer timer devices. Other suspicious items confiscated included a high-end video camera seized from the passenger compartment of the vehicle. You were taken into custody for possession of IED materials. You claim to have come to Iraq, through Iran, to produce a documentary video.

<u>You were advised of and had the following rights at the Board:</u>

(1) You have the right to be present at all open sessions of the Board.
(2) You have the right to testify or not to testify.
(3) You do not have the right to legal counsel, but you may have a personal representative assist you at the hearing if the personal representative is reasonably available.
(4) You have the right to present evidence, including the testimony of witnesses who are reasonably available.
(5) You have the right to examine and cross-examine witnesses.

<u>The following procedures applied at Board hearings:</u>

(1) All relevant evidence, including hearsay evidence, is admissible. The Board hearing is not adversarial. A recorder may present evidence to the Board. Witnesses will testify under an oath or affirmation to tell the truth.
(2) The Board's decisions are determined by a majority of voting members.

Although it is not necessary, if you wish to make another appearance before the board and have evidence, witnesses or a personal representative at the Board, you must deliver a written request to the Camp Commander of your detention facility before July 7, 2005. If you request another appearance, the board will again attempt to accommodate reasonable requests for persons who it finds are immediately available. If you have any questions concerning this board, please contact the Camp Commander with your inquiry and it will be forwarded to The Multi-National Force – Iraq Office of the Staff Judge Advocate for clarification.


                                        Lieutenant Colonel Dunlap
                                        President of the Board

## ACKNOWLEDGEMENT OF RECEIPT:

*Cyrus Kar*
Name of Detainee

Date: 7/7/05

Time: 12:55

## CHOOSE ONE:

1)  I understand that it is not necessary, but I would like to make another Appearance before the Status Board.

_____
Signature of Detainee

2)  I understand that I have the right to make another appearance before the board but I waive that right with the understanding that the board has determined that I am an "Innocent Civilian" as defined in this amended notification and that the board will recommend my release.

_____
Signature of Detainee

## CERTIFICATE OF SERVICE

On 7 July 2005, I, Carol V Haas, personally served a copy of "Detainee Status Board" dated July 6, 2005 on **Cyrus Kar**. This document notifies him of his rights and procedures at his Detainee Status Board.

Signed: Carol V Haas