## DECLARATION OF RANJANA NATARAJAN

I, Ranjana Natarajan, hereby declare:

The facts stated in this declaration are based upon my personal knowledge and if called to testify I could and would do so competently as follows:

1. I am Counsel to Petitioner Numan Al-Kaby in this petition for a writ of habeas corpus, and as such, I am familiar with the facts and legal issues herein.

2. On Tuesday, September 6, 2005, the U.S. government notified the Court and Counsel for Petitioner that the U.S. government had released Mr. Al-Kaby from Camp Cropper in Baghdad, Iraq, where he had been detained for five months.

3. On September 6, I attempted to contact Mr. Al-Kaby by telephone several times without success. On September 7 and 8, 2005, I spoke to Mr. Al-Kaby by telephone. He confirmed that he had been released from custody on September 6, 2005 and that he was staying with family in Baghdad. Since his release, he had just spent time with his family, with whom he had had virtually no contact for five months.

4. Mr. Al-Kaby was very relieved to be finally out of detention but deeply troubled by the effects of the detention on his health and family. He said that he had contracted tuberculosis while in detention and had developed high blood pressure. His elderly parents had become sick with worry, and his reputation in his parents' community was tarnished. After learning of his arrest, his wife had had a miscarriage and had divorced him. He had also lost his job with the American contractor for whom he had worked prior to his arrest. Finally, the U.S. military had lost all of Mr. Al-Kaby's belongings, including his personal computer, which it had seized at the time of his arrest. He was not provided any compensation for these items.

5. Mr. Al-Kaby said he did not know why he was held for two months even after he was declared an Innocent Civilian by a military court. He said that between his first court

1

hearing in July and his second hearing held on September 2, an FBI representative had asked him to help the FBI by spying on another prisoner. Mr. Al-Kaby had cooperated with the FBI, out of fear that he would be held for an even longer time if he did not cooperate. At his second hearing, he said that the government claimed they had new evidence on him, but they did not say what the new evidence was. Even then, the military judges released him again as an Innocent Civilian.

6. Mr. Al-Kaby said that he would like to return to the United States as soon as possible. His refugee travel document, or "refugee passport" as Mr. Al-Kaby calls it, was issued by the United States government prior to his departure from the United States last year. That document, which authorizes his return to the United States, apparently expired while he was in detention. He wants to get it renewed right away. At the time of his release, Mr. Al-Kaby asked U.S. military authorities to help him get his refugee passport renewed, or at least provide a letter for him to take to the U.S. embassy to verify that he had been in detention when the refugee passport had expired and therefore was not able to renew it before the expiration date. The U.S. military did not take him to the U.S. embassy or provide him with any such letter.

7. Mr. Al-Kaby believes that the U.S. embassy in Baghdad may refuse to renew his refugee passport, or even refuse to allow him to enter the building without a letter from the U.S. military, since the building has tight security and he has no current, valid U.S.-issued travel documents.

8. Although Mr. Al-Kaby's green card, which shows that he is a lawful permanent resident, is still valid, he must have a valid refugee travel document in order to return to the United States. See 8 C.F.R. § 223.2(b)(2).

9. Upon his return, Mr. Al-Kaby plans to live in Michigan and to continue pursuing his application for U.S. citizenship.

10. Mr. Al-Kaby does not know if he will be subjected to surveillance, monitoring, or travel restrictions. He does not know if the government will reject his citizenship application or try to strip him of his status as a lawful permanent resident, based on his five-month detention. At the time of his release, the U.S. military did not provide him with any information except to state that he was being released because he was found innocent a second time.

11. On September 7, 2005, I spoke to Counsel for Respondents Ori Lev by telephone. I asked Mr. Lev to confirm whether Mr. Al-Kaby would have any problems traveling within or outside Iraq, and whether the government would assist Mr. Al-Kaby with his refugee passport, if necessary.

12. After speaking with Mr. Al-Kaby, I wrote an email message to Assistant U.S. Attorney Ori Lev, who is Counsel for Respondents, on Friday, September 9, 2005. In the email, I asked for the U.S. government to provide assurances that: a) the U.S. embassy in Baghdad would timely renew Mr. Al-Kaby's expired refugee passport; b) Mr. Al-Kaby could safely return to the U.S. as a lawful permanent resident; c) the U.S. government would not impose any legal disabilities on Mr. Al-Kaby, such as travel restrictions, surveillance, and monitoring, based solely on his detention in Iraq.

13. I attempted to contact Mr. Al-Kaby by telephone on September 9, without success. When I make international phone calls to Mr. Al-Kaby or his family members in Baghdad, regardless of the time of day, I often hear a recorded message stating that the phone lines are not currently working. As a result, it is very difficult to contact Mr. Al-Kaby.

14. This morning, Counsel for respondents Ori Lev notified me by email that the government does not consent to Petitioner's motion for an extension of time. Counsel also stated that he is not familiar with the term "refugee passport" and therefore has been unable to obtain additional information about renewing Mr. Al-Kaby's expired travel document.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of September 2005 in Los Angeles, California.

_RNatarajan_
Ranjana Natarajan